# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| CROSBY MARINE TRANSPORTATION, LLC., ET AL | * | CIVIL NO. 13-2399 |
| VERSUS | * | MAGISTRATE JUDGE HILL |
| TRITON DIVING SERVICES, LLC, ET AL | * | BY CONSENT OF THE PARTIES |

## REASONS FOR JUDGMENT

The non-jury trial of this case commenced on June 2, 2015 and concluded on June 8, 2015.

## Findings of Fact

After due consideration of the facts and evidence which were presented by the parties at the trial of this matter through live witnesses, exhibits and deposition testimony, and having had the opportunity to assess the demeanor of the live witnesses, and review and weigh the evidence, this Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, which the Court finds and holds were established by a preponderance of the evidence.[1]

1.    Mark Rottinghaus ("Rottinghaus"), a Louisiana resident, was employed by Crosby Marine Transportation, L.L.C. and Crosby Tugs, L.L.C. ("Crosby") as

---

[1]To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

a deckhand and apprentice mate.

2.    Crosby is the owner and operator of the ocean tugs, M/V CROSBY MARINER and M/V CROSBY EXPRESS.

3.    Triton Diving Services, L.L.C. ("Triton") is the owner and operator of the dive vessel, the M/V TRITON ACHIEVER.

4.    On May 21, 2013, Rottinghaus, a Jones Act seaman, was employed aboard the tug, CROSBY MARINER, as a deckhand and steersman.

5.    On May 21, 2013, Jeremy Naccio ("Naccio"), who was employed by Crosby, was piloting the M/V CROSBY EXPRESS.

6.    On May 21, 2013, Israel Delatte ("Delatte"), who was employed by Crosby, was piloting the M/V CROSBY MARINER, an assist tug to the M/V CROSBY EXPRESS.

7.    On May 21, 2013, the CROSBY EXPRESS was towing, on a short hawser, the barge MARMAC 22, with the CROSBY MARINER made up on the port side (hip) of the MARMAC 22 with soft lines as an assist vessel. (This configuration is sometimes referred to herein as "the Crosby tow.").

8.    The MARMAC 22 is a 250-foot long, 72-foot wide deck barge, which, on May 21, 2013, was laden with a deck cargo of scrap iron sections of a dismantled offshore oil platform (a well jacket) that extended 40 feet over the stern of the barge and also extended over the starboard side of the barge an unknown

2

distance.

9.  The tug CROSBY MARINER is 71.4 feet in length, with a 26.1-foot beam, a hull depth of 9.9 feet and bears official No.: 642126.

10. The tug CROSBY EXPRESS is 86.4 feet long, with a 28 foot beam and a hull depth of 11 feet and bearing official No.: 1082131.

11. Naccio testified, which the Court accepts as true, that the CROSBY MARINER had tires attached to both sides of the vessel, making the vessel 29.1 feet wide if the tires are included.

12. Prior to commencing the tow, Crosby had obtained an oversize tow permit from the Coast Guard.

13. On May 21, 2013, Charles Hempfling ("Hempfling"), who was employed by Triton, was piloting the TRITON ACHIEVER.

14. The TRITON ACHIEVER is a 4 point dive support vessel with a length of 195 feet, a beam of 40 feet and a depth of 14 feet, bearing official No.: 597269.

15. In the early morning hours of Tuesday, May 21, 2013, the TRITON ACHIEVER departed the Triton dock in Amelia, Louisiana bound for an offshore work site to perform a riser installation job for Chevron Oil Company. To access the Gulf of Mexico from the Intracoastal Waterway, the ACHIEVER set a southbound course for the Gulf of Mexico through Bayou Chene, navigable waters, inland Louisiana.

3

16.   At the same time that the TRITON ACHIEVER was proceeding southbound in Bayou Chene, the CROSBY EXPRESS and the CROSBY MARINER with the barge MARMAC 22 were proceeding northbound in Bayou Chene, bound for a yard in Bayou Black, Louisiana.

17.   Bayou Chene is a natural channel with the width of approximately 325-400 feet and a dredged navigable channel approximately 15 feet in depth and maintained by the U.S. Corps of Engineers to 150 feet in width.  The actual navigable channel at the site of the accident is wider than 150 feet.

18.   Between 2:30 a.m. and 3:00 a.m. on May 13, 2013, the TRITON ACHIEVER was heading southbound on Bayou Chene.

19.   At the same time, the CROSBY MARINER and the CROSBY EXPRESS were heading northbound on Bayou Chene with their tow.

20.   Hempfling detected the CROSBY MARINER/CROSBY EXPRESS on the TRITON ACHIEVER'S automatic identification system (AIS) when the Crosby vessels were about one and a half miles away.

21.   When the TRITON ACHIEVER was about one mile from the Crosby vessels, Hempfling called Naccio, who was piloting the CROSBY EXPRESS.

22.   Hempfling could see on the TRITON ACHIEVER's radar that two tugs and a barge were approaching.

4

23.    Naccio informed Hempfling that he had a tow on a short hawser, and requested that the vessels make a port-to-port, one-whistle, pass and Captain Hempfling agreed.

24.    There was no radio communication by either captain about the CROSBY MARINER being made up to the port side of the MARMAC 22.  Naccio did not inform Hempfling that the CROSBY MARINER was made upon the hip of the MARMAC 22.  Hempfling did not ask about the presence of the second tug, the CROSBY MARINER.

25.    The two vessels approached each other to make their pass in an area of Bayou Chene know as "The Wiggles."  This is an area that has a starboard turn, followed by about a .5 to .6 nautical mile straightaway followed by a turn to port (northbound).

26.    Naccio knew that the Cashman Barge Fleet was tied up, two barges abeam, on his starboard shore, so he would have to steer to port to avoid those barges.

27.    The current of Bayou Chene at this location was north and not south.  Thus, the Crosby tow was traveling with the current.

28.    When Hempfling observed the Crosby vessels coming around the bend, he reduced his speed from six knots to three and a half to four knots and moved over more to starboard towards the bank.  Hempfling was surprised at the size and configuration of the Crosby tow.

5

29.    As the Crosby tow rounded the bend to starboard, the stern of the tow swung out to port. This movement to port was caused by the speed of the tow and increased because the Crosby tow was traveling with the current.

30.    At the time Hempfling passed the Crosby vessels and barge, the TRITON ACHIEVER was in a water depth of about five feet and was bumping the bottom of the channel.

31.    The TRITON ACHIEVER suddenly veered to port and struck the CROSBY MARINER on the port bow, bounced off and then hit the MARMAC 22.

32.    The accident was caused when the TRITON ACHIEVER approached the bank of Bayou Chene, on the vessel's starboard side. As the channel began to shelve (become more shallow), the water between the vessel and the bank displaced, causing the bow of the TRITON ACHIEVER to veer suddenly to port. This is called "banking" or "shearing".   Additionally, the larger displacement of the Crosby tow "sucked" the Triton vessel into the Crosby tow, a secondary cause of the collision.  Hempfling was forced close to the bank on his starboard side to avoid the Crosby tow.

33.    At the time of the collision, the CROSBY MARINER's speed was 6.5  knots.

34.    The collision occurred at approximately 2:50 a.m. on May 21, 2013.

35.    Screen shots from the "Captain Voyager" computer software shows that Hempfling left the maintained channel, moving to starboard, to allow the

Crosby tow to pass and that the impact was outside the maintained channel, on the TRITON ACHIEVER side of the maintained channel.

36.   The collision was severe enough to damage the CROSBY MARINER, the TRITON ACHIEVER and the MARMAC 22, including displacing the stuffing box at the shaft exit of the CROSBY MARINER, displacing appliances in the galley of the CROSBY MARINER, and knocking over the Captain's chair on the CROSBY MARINER onto the wheelhouse deck.

37.   As the vessels approached, Rottinghaus was off watch and sleeping in his bunk.

39.   When Delatte saw the ACHIEVER veer suddenly toward him, he sounded the General Alarm.  This woke Rottinghaus from his sleep.  He grabbed his life jacket and then the vessels collided.

40.   When the collision occurred, Rottinghaus struck his head and neck on the frame of the bunks.

41.   Rottinghaus was dazed by the impact.  It is unclear whether he actually lost consciousness or not, but he sustained at least an altered state of consciousness from striking his head.

42.   Rottinghaus then proceeded immediately to the wheelhouse for orders. Rottinghaus told Delatte that he had struck his head and neck and was hurt.

7

43.     Rottinghaus also felt nauseous, and went several times to the head where he had "dry heaves."  This fact is not supported by Delatte, who did not remember Rottinghaus complaining of nausea. Delatte conceded he might have forgotten that fact under the circumstances.  Given the situation, the Court is not surprised that Delatte did not remember this detail which was insignificant at the time.  The Court credits Rottinghaus' testimony in this regard and finds it as fact.

44.     Immediately after the May 21, 2013 collision, Rottinghaus was seen by Crosby's company doctor, Dr. Robert Davis, at Occupational Medicine Services, LLC. in Houma, Louisiana.  Dr. Davis noted that Rottinghaus complained of pain primarily in the right posterior neck at the base of the skull as a result of a vessel collision.  Rottinghaus reported that the impact threw him back, causing the back of his neck to strike the edge of his bunk very hard. Rottinghaus reported no loss of consciousness, dizziness, headache or radicular symptoms to the right arm.  Dr. Davis' diagnosis was a contusion and strain injury, for which he prescribed conservative measures.

45.     At the next visit on May 24, 2013, Rottinghaus complained of intensified pain in the posterior neck and some mild intermittent tingling sensation in his right hand.  Because of Rottinghaus' continued pain and limited range of motion, Dr. Davis ordered an MRI.

8

46.  The MRI report of the MRI performed on May 28, 2013, noted a slight reversal of lordosis and a 1-2 mm disc bulge at C6-C7.  Dr. Davis recommended physical therapy.

47.  A pre-accident MRI showed no pathology at the C5-6 and C6-7 levels.

48.  On May 30, 2013, Mr. Rottinghaus was examined by Dr. Robert Franklin, a physical medicine and rehabilitation physician.  At this time, Mr. Rottinghaus was reporting neck pain, right arm numbness and tingling, and consistent headaches.  Dr. Franklin ordered a second MRI, which was reported as revealing a loss of normal cervical lordosis with slight kyphosis at C3-4, mild right C5-6 facet arthrosis, and slight C6-7 and C7-Tl annular bulges.  Dr. Franklin recommended physical therapy.

49.  Rottinghaus underwent 79 physical therapy visits from June 5, 2013 through December 30, 2013, with Scott Higgs, P.T. ("Higgs"), at Ponchatoula Therapy.  On the first visit, he complained of neck pain and tingling in the right upper extremity.  Later, he complained of migraine headaches.  As of Rottinghaus' last visit on December 30, 2013, he was still having right arm numbness, substantially restricted cervical range of motion, and muscle spasm.  Rottinghaus attended physical therapy as scheduled.  Higgs reported that Rottinghaus was compliant, but had maximized progress in physical therapy.

50. Rottinghaus began treating with Dr. George Williams, an orthopedic surgeon with a sub-specialty in spine surgery, on July 9, 2013. Rottinghaus complained of neck pain and right arm numbness after hitting his head on a bunk. Dr. Williams' diagnosis was cervical disc disease, spinal stenosis and cervical radiculopathy.

51. After conservative treatment consisting of physical therapy, anti-inflammatory medications and cervical epidural steroid injections failed, Dr. Williams referred Rottinghaus to Dr. David Weir, a neurologist and neurophysiologist, for evaluation and a nerve conduction study.

52. Dr. Weir diagnosed Rottinghaus with radiculopathy at the C6 region, post-concussion syndrome, frequent headaches, and cervicalgia in November 2013. He placed Mr. Rottinghaus on headache medications (one preventative (Zonegran) and one abortive (Maxalt)), which have provided partial relief from the frequent and severe migraine headaches he was having as a result of the accident and head trauma.

53. The May 30, 2013, MRI films were reviewed at trial by Dr. Williams, who testified that the films showed annual tears with leakage of disc material into the midline of Rottinghaus' axial spine and into the right neural foramen area at the exiting nerve root, producing a chemical irritation or chemical radiculopathy.

10

54.  On January 14, 2014, Mr. Rottinghaus underwent an EMG/Nerve Conduction study with Dr. Weir.  According Dr. Weir, the results were positive for right C6 radiculopathy, which was consistent with Mr. Rottinghaus' complaints of right arm and hand numbness and tingling.

55.  Both Dr. Williams and Dr. Weir observed annular bulging and fissures (or tears) at C5-6 and C6-7 on the MRI.  Dr. Weir and Dr. Williams testified that fissures at those levels were consistent with, and explained, Rottinghaus' complaints of right arm and hand numbness as well as neck pain.

56.  Based on Dr. Weir's test results and Rottinghaus' history, Dr. Williams diagnosed Mr. Rottinghaus with cervical radiculopathy, annular fissures, spondylosis, and herniated discs at C5-6 and C6-7, all of which he believed to a reasonable degree of medical certainty were caused by the May 21, 2013 incident.  He recommended surgery at C5-6 and C6-7.

57.  On March 28, 2014, Dr. Williams performed a two-level anterior cervical decompression, fusion and interbody spacer graft with instrumentation on Rottinghaus' cervical spine at C5-C6 and C6-C7.

58.  Post-surgery, Rottinghaus' radiculopathy completely resolved and his neck range of motion improved.  Dr. Williams testified that Rottinghaus reached maximum medical improvement on April 21, 2015.

59.  Dr. Williams testified that Rottinghaus was limited to light duty work.  Dr. Williams testified that Rottinghaus' unpredictable, recurrent migraine headaches, as well as his physical restrictions, preclude him from being able to work as a deckhand or mate on a vessel.

60.  Dr. Williams testified that Rottinghaus' future medical costs would include occasional anti-inflammatory medication for his cervical condition.

61.  Prior to the accident, Rottinghaus had no neck pain, no radiculopathy and no headaches.

62.  After the two-level fusion, Rottinghaus was neck pain-free and had no radiculopathy.  The Court therefore concludes, and finds as fact, that Rottinghaus' neck pain and radiculopathy were caused by this accident and that the surgery was made necessary by the injuries sustained by Rottinghaus at the time of the accident.

63.  The post-accident headaches, while less frequent, have persisted for over two years.  The evidence shows that the headaches are therefore likely to be permanent.  Initially, these headaches were almost daily lasting as long as approximately five hours.  Rottinghaus is now on Zonegran and Maxalt to control his headaches.  These headaches now occur episodically, approximately twice per month.  The evidence was uncontradicted that these medications will be required permanently to control the headaches.

64.   Rottinghaus has sustained short-term memory loss and frequent confusion, particularly during conversations.  This was caused by cognitive impairment as a result of Rottinghaus sustaining post-concussion syndrome because of this accident.   Since the accident, he has progressed to a level of approximately 90% of his pre-accident mental capacity.  Additional progress is unlikely.

65.   Rottinghaus continues to suffer unannounced episodes of photophobia and phonophobia, as well as the headaches.

66.   Rottinghaus can be trained to partially compensate for his loss and how to keep up with the activities of daily living.  This will increase his post-accident wage earning capacity.

67.   Rottinghaus roomed in a house with Jessica Lang ("Lang"), her husband (a friend of his from the military) and their children, both before and after the accident.  Lang saw Rottinghaus right after the accident; he was groggy and wanted to go lie down.  Prior to the accident, Rottinghaus never complained about anything.  After the accident, he would often go to his room and lie down for hours.  After the accident, Rottinghaus talked a lot slower than he had before the accident.

68.   The migraine headaches that Rottinghaus has are now less frequent than they were right after the accident, but they still occur.  Lang drove Rottinghaus to

his physical therapy visits several times, because it was difficult for Rottinghaus to drive after the accident – he would get groggy and have to lie down when he got home.

69. Many of the things that Rottinghaus and Lang's husband did together prior to the accident, he can no longer do.  He is more forgetful, and he has to stop and occasionally think for a second while speaking, something he did not have to do before the accident.  In the middle of a sentence, he will pause or stop for a second, to recollect his thoughts, or sometimes completely forget what he was saying.  This did not happen before the accident.

70. Rottinghaus no longer lived with the Langs as of the date of trial.

71. The Court carefully observed Lang's testimony at trial.  The Court found her to be a credible witness as she answered all questions directly and, quite clearly, did not recognize the significance of some of her answers, nor the significance of some of the questions which she was asked.

72. Rottinghaus would benefit from cognitive retraining which would help him in his daily living and would maximize his ability to return to work.  Rottinghaus will also need psychological counseling for the next two to three years.

73. Prior to the accident, Naccio characterized Rottinghaus as a "good hand", energetic, and hungry to learn with a good work ethic.

74.   The Court found Rottinghaus to be a highly credible witness.  This conclusion results from the Court's careful consideration of Rottinghaus' demeanor on the witness stand, and the way in which he answered questions both on direct and cross-examination. As Long testified, Rottinghaus spoke slowly and often paused when answering questions, not only on cross examination but also on direct. Lang's testimony was that Rottinghaus did not do this before the accident. This verbal behavior confirms the neuropsychological deficits revealed on the neuropsychological testing.   Additionally, the fact that Rottinghaus told the physicians, and testified in court, that he was pain-free after his surgery adds  to his credibility.[2]  Finally, all of the physicians and experts, including those retained by the defendants, testified that Rottinghaus completely cooperated with them, exerted the maximum effort on the FCE which was obtained by the defendants, was honest in answering their questions and exhibited no signs of malingering.  Additionally, Rottinghaus' co-employees, as well as his supervisors, were unanimous in testifying as to his good character and work ethic.

75.   Rottinghaus began working for Crosby at age 23.  While working for Crosby, he obtained his steersman apprentice license from the U.S. Coast Guard.  He was working towards his mate's license.  At the time of the collision, he was

---

[2] In the Court's experience, it is rare for a claimant to acknowledge that he is "pain-free" with a full range of motion at trial.  That was the testimony of Rottinghaus.

28.6 years old.

76.   At the time of the collision, Rottinghaus was earning $285 per day as an apprentice steersman and deckhand.  His annual earnings in 2012 totaled $86,435.  His earnings in 2013 up through the date of the accident, if annualized, total $101,000.

77.   Crosby has posted security in the amount of $3,299,063.30 with interest at 6% annum from the date it filed its complaint.

78.   Crosby Marine and its employees were at fault in causing this accident for the following reasons:

1.   Naccio failed to adequately describe the size of the tow and the configuration of the tow that he was pulling when suggesting the passing rule to Hempfling;

2.   Naccio failed to consider the narrowness of the passing area considering the bend in the channel, the following current and the presence of the Cashman Fleet;

3.   Naccio failed to stay as close as possible to the starboard bank while passing the Triton vessel;

4.   Naccio failed to maintain a safe speed in the bend to starboard considering the presence of the Cashman Fleet, the width of the channel, the following current and the oncoming Triton vessel;

5.     Naccio failed to suggest safe passing rules considering the bends in the channel, the presence of the Cashman Fleet and the following current.

79.   Triton Marine and its employees were at fault in causing this accident for the following reasons:

1.     Hempfling failed to adequately determine the size of the oncoming tow;

2.     Hempfling failed to identify both of the tugboats and their functions on the oncoming tow when he first saw them on his radar and when he talked to Naccio;

3.     Hempfling failed to stop and allow the Crosby tow to pass, particularly once he realized the size of the Crosby tow, the bends in the channel, the presence of the Cashman Fleet and the fact that the Crosby tow was proceeding with the current.

## Conclusions of Law

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following conclusions of law:

## JURISDICTION AND VENUE

1.     Rottinghaus is a resident of Baton Rouge, Louisiana.

2.     Crosby is a Louisiana limited liability corporation with its principal office located in Galliano, Louisiana.  Crosby is authorized to do, and does,

17

business within the Western District of Louisiana.

3.    Triton is a Louisiana limited liability corporation with its principal place of business in Metairie, Louisiana.  Triton is authorized to do, and does, business within the Western District of Louisiana.

4.    Rottinghaus filed this action under pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims, and 28 U.S.C. § 1333.

5.    Thus, this action falls within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. §1333.

6.    Venue is proper in this district court as the accident involved in this litigation took place in the Western District of Louisiana.  28 U.S.C. §1391.

## JONES ACT

7.    Rottinghaus was a Jones Act seaman on the date of the collision.

8.    The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law . . . ."   46 U.S.C. § 688; *Broussard v. Stolt Offshore, Inc*., 467 F.Supp.2d 668, 669 (E.D. La. 2006).

9.    Under the Jones Act, a seaman has a cause of action against his employer for negligence.  *Becker v. Tidewater*, 335 F.3d 376, 386 (5th Cir. 2003).

10. The fundamental duty of a Jones Act employer is to provide his seaman

employees with a reasonably safe place to work.  *Colburn v. Bunge Towing,*

*Inc.*, 883 F.2d 372, 374 (5th Cir.1989); *see* Thomas J. Schoenbaum,

ADMIRALTY AND MARITIME LAW § 6-21 (5th ed. 2014).  A Jones

Act employer's duty to provide a reasonably safe place to work is "absolute

and non-delegable."  Schoenbaum, § 6-21.

11. The Jones Act employer's potential liability extends to all personal injuries

arising during the course of the seaman's employment, but proof of

negligence is essential to recovery.  *Blaauw v. Superior Offshore*

*International, LLC*, 2008 WL 4224808, at *10 (W.D. La. Sept. 10, 2008).

Such negligence may arise in many ways including the failure to use

reasonable care to provide a seaman with a safe place to work, the existence

of a dangerous condition on or about the vessel, failure to inspect the vessel

for hazards, failure to take precautions to protect a seaman or any other

breach of the duty of care.  *Id*. (*citing Davis v. Hill Engineering, Inc*., 549

F.2d 314, 329 (5th Cir.1977), *overruled on other grounds by Gautreaux v.*

*Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997)); Schoenbaum, §

6-21.

12. The duty of care owed by an employer under the Jones Act is that of

ordinary prudence, namely, the duty to take reasonable care under the

circumstances.  *Blaauw*, at *10 (*citing Gautreaux*, 107 F.3d at 338-339).

13.    "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Id*. (*quoting Turner v. Inland Tugs Co.*, 689 F.Supp. 612, 619 (E.D. La.1988)); *see also Pechawer v. Art Catering, Inc*., 2007 WL 2127824, *3 (E.D. La. June 25, 2007).

14.    The seaman bears the evidentiary burden of proving that a breach of a duty owed by the employer was a cause of his injuries.  *Blaauw*, at *10 (*citing Davis*, 549 F.2d at 331).

15.    A cause of action under the Jones Act arises when this duty is breached. *Blaau*, at *10.

16.    The standard for causation in a Jones Act case is clear: "a defendant must bear responsibility for his negligence if such negligence played any part, even the slightest, in producing the injury" for which damages are sought. *Blaaw*, at *10 (*citing Landry v. Oceanic Contractors, Inc*., 731 F.2d 299, 302 (5th Cir. 1984)).

## <u>UNSEAWORTHINESS</u>

17.    A Jones Act seaman "may also sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness." *Broussard*, 467 F.Supp.2d at 670 (*quoting Becker*, 335 F.3d at 387).

18. In order to recover for the alleged unseaworthiness of the M/V CROSBY

MARINER, Rottinghaus must show that Crosby "provided a vessel

(including its appurtenances, gear and equipment) that was not reasonably

fit for its intended purposes." *Broussard*, 467 F.Supp.2d at 670 (*quoting*

*Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir.

1992)).

19. "[A]n unsafe method of work may . . . render a vessel unseaworthy."

*Broussard*, 467 F.Supp.2d at 670; *see also Usner v. Luckenbach Overseas*

*Corp.*, 400 U.S. 494, 91 S.Ct. 514, 518, 27 L.Ed.2d 562 (1971).

20. An unseaworthiness remedy under general maritime law requires proof of

legal cause in the traditional tort sense, as opposed to the lessened burden of

proof required in Jones Act claims. *Broussard*, 467 F.Supp.2d at 670

(*citing* Frank L. Maraist & Thomas C. Galligan, Jr., *Personal Injury in*

*Admiralty* § 6-3(e), at 101-02 (2000)).

21. An unseaworthy condition is the legal cause of an injury if it "played a

substantial part in bringing about or actually causing the injury and that the

injury was either a direct result or a reasonably probable consequence of the

unseaworthiness." *Phillips*, 953 F.2d at 928; *Brister v. A.W.I., Inc.*, 946

F.2d 350, 355 (5th Cir.1991).

## MARITIME NEGLIGENCE

22. A Jones Act seaman may also sue third parties for general maritime law negligence. *Becker,* 335 F.3d at 387 (*citing Usner*, 400 U.S. at 498).

23. The standard for negligence under the general maritime law is essentially the same as that under general negligence law; accordingly, in analyzing maritime tort cases, courts rely on the general principles of negligence law. *Blaauw*, at *13 (*citing Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir.1980)).

24. To establish maritime negligence, a plaintiff must "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiffs injury." *Delta Towing LLC v. Basic Energy Services*, 2011 WL 102717, at *3 (W.D. La. Jan. 12, 2011) (Doherty, J.) (*citing Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (alterations in original) (*quoting In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).

25. Whether a defendant owes a plaintiff a legal duty is a question of law. *Delta Towing*, at *3.

26. The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and

regulatory rules and recognized customs and uses.  *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006).

27.   In maritime collision cases, fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract.  *Delta Towing*, at *3 (*citing Inter-Cities Nav. Corp. v. U.S.*, 608 F.2d 1079, 1081 (5th Cir. 1979)). "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.'"  *American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir.1998) (*quoting Inter Cities* at 1081)). "But-for" causation is insufficient, in and of itself, to give rise to liability.  *Id*.

28.   Establishing liability in a collision case is eased by the *Pennsylvania* Rule, which provides that when a vessel is in violation of a statutory duty, the burden is on the offending vessel to prove that its conduct did not and could not have caused the collision.  *Stolt*, 447 F.3d at 364.  The Rule states:

[W]hen  . . . a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*Delta Towing*, at *3 (*citing American River*, 148 F.3d at 449 (*citing The Steamship Pennsylvania v. Troop*, 86 U.S. 125 (1873)).

29.   The Rule addresses burden of proof; it is not a rule of ultimate liability. *Delta Towing*, at *3  (*citing American River*, 148 F.3d at 449; *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1472 (5th Cir.1991)).

30.   Where both parties to a collision are in violation of statutes designed to prevent collisions, the court may apportion fault between the parties, unless either party proves that its statutory violation was not a substantial contributing cause of the collision.  *Stolt*, 447 F.3d at 34.

31.   Even without a statutory violation, liability may be imposed simply where there is negligence.  *Stolt*,  447 F.3d at 364 (*citing Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995)).

32.   The Inland Navigation Rules, also known as the "Rules of the Road," apply to all vessels upon the inland waters of the United States, including Bayou Chene, Louisiana.  *See* 33 C.F.R. § 83.01 *et seq*.

33.   Rule 6 of the Inland Navigation Rules governs safe speed of vessels, and provides as follows:

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(1) The state of visibility;

(2) The traffic density including concentration of fishing vessels or any other vessels;

(3) The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

*** 

(6) The draft in relation to the available depth of water.

33 C.F.R. § 83.06 (2013).

34.    Rule 7 of the Inland Navigation Rules, governing risk of collision, provides, pertinent part, as follows:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

***

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

***

(ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

33 C.F.R. § 83.07 (2013).

35.    Rule 8 of the Inland Navigation Rules, governing actions to avoid collision, provides as follows:

25

(a) Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

(b) Any alteration of course and/or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided.

(c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.

(d) Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.

(e) If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

(f) *Early action to allow room for safe passage*:

(1) A vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.

(2) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when taking action, have full regard to the action which may be required by the Rules of this part.

(3) A vessel the passage of which is not to be impeded remains fully obliged to comply with the Rules of this part when the two vessels are approaching one another so as to involve risk of collision.

33 C.F.R. § 83.08 (2013).

26

36.  Vessels navigating Bayou Chene must adhere to the Narrow Channel Rules

(Rules 9 and 14) unless otherwise agreed.  *Burma Navigation Corp. v.*

*Reliant Seahorse MV*, 99 F.3d 652, 658 (5th Cir. 1996) (*citing Marine*

*Transport Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1144 (5th Cir.

1994)).

37.  Rule 9, governing narrow channels, provides:

(a) Keeping near to outer limit of channel or fairway which lies on vessel's
starboard side; exception.

(1) A vessel proceeding along the course of a narrow channel or fairway
shall keep as near to the outer limit of the channel or fairway which lies on
her starboard side as is safe and practicable.

33 C.F.R. § 83.09 (2013).

38.  It has been held that "vessels crossing the centerline at the last moment in

the narrow channel are at fault and are responsible for the damages

resulting therefrom."  *Burma*, at 658.

39.  However, a vessel's position on one side or the other of the center of the

channel does not conclusively establish that a rule was violated.  *Burma*, at

658.  The downbound vessel's right-of-way under Rule 9(a)(ii) is

conditional – it depends on the downbound vessel's having proposed a

manner and place of passage and initiated the maneuvering signals

prescribed by Rule 34(a)(i), as appropriate.  *Id.* (*citing Marine Transport*,

37 F.3d at 1143-44).

40.     When the downbound vessel exercises its authority under Rule 9(a)(ii),[3] the

upbound vessel must give way, even "hold as necessary to permit safe

passing.  *Marine Transport*, 37 F.3d at 1144 (*citing* 33 U.S.C. 2009(a)(ii)).

41.     Rule 14 of the Inland Navigation Rules governs "head-on" meeting

situations.  Rule 14(d) provides as follows:

(d) Notwithstanding paragraph (a) of this Rule, a power-driven
vessel operating on the Great Lakes, Western Rivers, or waters
specified by the Secretary, and proceeding downbound with a
following current shall have the right-of-way over an upbound
vessel, shall propose the manner of passage, and shall initiate the
maneuvering signals prescribed by Rule 34(a)(i) (§83.34(a)(i)), as
appropriate.

33 U.S.C. § 83.14 (2013).

42.     Inland Rules 9(a)(ii), 14(d), and 15(b) apply on the Great Lakes, the Western

Rivers, and the following specified waters: (a) Tennessee-Tombigbee

Waterway; (b) Tombigbee River; (c) Black Warrior River; (d) Alabama

River; (e) Coosa River; (f) Mobile River above the Cochrane Bridge at St.

Louis Point; (g) Flint River; (h) Chattahoochee River; (i) The Apalachicola

River above its confluence with the Jackson River.  33 C.F.R. § 89.25

---

[3]Rule 9(a)(2) provides: Notwithstanding paragraph (a)(1) of this Rule and Rule 14(a), a
power-driven vessel operating in narrow channels or fairways on the Great Lakes, Western Rivers, or
waters specified by the Secretary, and proceeding downbound with a following current shall have the
right-of-way over an upbound vessel, shall propose the manner and place of passage, and shall initiate the
maneuvering signals prescribed by Rule 34(a)(1),  as appropriate. The vessel proceeding upbound against
the current shall hold as necessary to permit safe passing.

33 C.F.R. § 83.09 (2013).

(2013).  Accordingly, these Rules does not apply to Bayou Chene.

## LIMITATION OF LIABILITY

43.   Crosby's alternative claim is that it entitled to limit its liability.  The claim for limitation of liability is based on 46 U.S.C. § 30505.  As a general matter, the liability of a vessel owner for a property damage claim arising out of an allision shall not exceed the value of the vessel and pending freight, if the negligent act causing the allision occurred without the vessel owner's privity or knowledge. 46 U.S.C. § 30505; *Delta Towing*, *2.

44.   Privity or knowledge, sometimes described as "complicity in the fault," extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation.  *Delta Towing*, at *2 (*citing In re Signal Intern., LLC*, 579 F.3d 478, 496 (5th Cir. 2009)).  "If the owner is chargeable with privity or knowledge, he may not limit."  *Id*. (*citing Coleman v. Jahncke Service, Inc*., 341 F.2d 956, 957 (5th Cir. 1965)).

45.   Once a claimant proves that negligence  . . .  caused an accident, an owner seeking limitation must show it lacked privity or knowledge of the condition. *Delta Towing*, at *2 (*citing Petition of Kristie Leigh Enterprises, Inc*., 72 F.3d 479, 481 (5th Cir. 1996)); *see also Coleman*, at 958 (Petitioner in limitation bears burden of proving lack of privity or knowledge; the burden of proving negligence lies with the claimants).

29

46.   Stated otherwise, the determination of whether a shipowner is entitled to
limitation employs a two-step process: first, the court must determine what
acts of negligence (or conditions of unseaworthiness) caused the accident;
second, the court must determine whether the shipowner had knowledge or
privity of those same acts of negligence or conditions of unseaworthiness.
*Delta Towing*, at *2 (*citing Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th
Cir. 1976)); *Kristie Leigh*, 72 F.3d at 481 (footnote omitted).

47.   A vessel owner's "burden to prove lack of privity or knowledge only arises
when  . . .  [the claimant] has shown unseaworthiness [or negligence] was
the proximate cause of the loss.  *Delta Towing*, at *2 (*citing In re Signal
Intern., LLC*, 579 F.3d 478, 496 (5th Cir. 2009)). Thus, whether or not the
vessel owner had knowledge of other acts of negligence is immaterial. *Id*. at
500; *see also Farrell,* 530 F.2d at 10 ("Knowledge or privity of any fact or
act causing the accident is not enough for denial of limitation; it is only
knowledge or privity of negligent acts or unseaworthy conditions which
trigger a denial of limitation.").

48.   To preclude limitation, a shipowner's knowledge need not be actual; rather,
he is charged with knowledge of acts or events that could have been
discovered through reasonable diligence.  *Delta Towing*, at *2 (*citing
Empresa Lineas Maritimas Argentinas S.A. v. U.S.*, 730 F.2d 153, 155 (5th

30

Cir. 1984)).

49.   A corporate owner is charged with the knowledge of its managing agents
who have authority over the sphere of activities in question. *Kristie Leigh,*
72 F.3d at 481.

50.   A denial of exoneration does not necessarily preclude a grant of limitation of
liability. *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977).  Exoneration
is contingent upon a finding of no contributory fault. *Id.*

## DAMAGES

51.   Under the Jones Act and general maritime law, an injured seaman is entitled
to monetary recovery for past, present and future loss of earning capacity
and wages, medical expenses, and pain and suffering resulting from an
injury caused by negligence and/or unseaworthiness. *Blaauw*, at  *14
(*citing Schoenbaum,*  §§ 5-15 and 6-18; *Nichols v. Weeks Marine, Inc.*, 513
F. Supp. 2d 627, 637 (E.D. La. 2007)).

52.   With the exception of awards for future pain and suffering, future losses
(income and medical expenses) must be discounted to present value.
*Blaauw*, *14 (*citing Culver v. Slater Boat Co.* (*Culver II*)*, 722 F.2d 114,
117 (5th Cir. 1983); Schoenbaum, §§ 5-15 and 6-18; *O'Byrne v. St. Louis
Southwestern Ry. Co.*, 632 F.2d 1285, 1286 (5th Cir. 1980)).

53.  Future lost income must also reflect a judgment to net, after-tax value. *Blaauw*, at *14**.**

54.  Lost earning capacity in the past is usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial.  *Blaauw*, at *14 (*citing Schoenbaum*, § 5-16; *Johnson v. Cenac Towing Inc.*, 468 F.Supp.2d 815, 834 (E.D. La. 2006) *aff'd in part, vacated in part, remanded*, 544 F.3d 296 (5th Cir. 2008)).

55.  The Fifth Circuit has established a four-step method for calculating future loss of earning capacity in maritime cases in *Culver II*.  To determine future lost wages, the Court must: (1) estimate the expected remaining work-life of the claimant; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value.  *Blaauw*, at *15 (*citing Culver II*, 722 F.2d at 117; Schoenbaum, § 5-16.2).

56.  There is a difference between future loss of earnings and loss of earning capacity.  *Lambert v. Teco Barge Line*, 2007 WL 2461681, at *1 (E.D. La. Aug. 23, 2007) (*citing Culver II*, 722 F.2d at 117).  A calculation of the lost income stream begins with the gross earnings of the injured party at the time of the injury.  *Id*.  While the determination of Plaintiff's future loss of earnings is tied to what Plaintiff was earning at the time of his alleged accident, the determination of Plaintiff's loss of earning capacity is not so

limited because the jury may consider evidence of the enhanced earnings of

tug boat captains, post-Katrina.  *Id*.

57.    An award for pain and suffering may include a sum for mental anguish and

physical discomfort, and for the mental and physical effects of the injury on

the plaintiff's ability to engage in those activities which normally contribute

to the enjoyment of life.  *Blaauw*, at *15 (*citing* Schoenbaum, §§ 5-16.3 and

6-18.4).

58.    These damages are not subject to precise measurement.  *Blaauw*, at *15.

Any amount to be awarded for pain and suffering depends to a great extent

on the trial court's observation of the plaintiff and its subjective

determination of a reasonable amount needed to achieve full compensation.

*Id*. (*citing Hyde v. Chevron U.S.A ., Inc*., 697 F.2d 614, 632 (5th Cir.

1983)).  An award for pain and suffering also depends on the facts of the

particular case.  *Id*. (*citing Allen v. Seacoast Products, Inc*., 623 F.2d 355,

364-365 (5th Cir. 1980), *overruled by Gautreaux v. Scurlock Marine, Inc*.,

107 F.3d 331 (5th Cir. 1997)).

## MAINTENANCE AND CURE

59.    A seaman is also entitled to receive maintenance and cure from his

employer if he becomes ill or injured during his service to the ship.

*Boudreaux v. United States,* 280 F.3d 461, 468 (5th Cir. 2002).  A vessel

owner must pay maintenance and cure to any seaman who becomes ill or injured during his service to the ship, regardless of whether the vessel owner was negligent. *Bertram v. Freeport McMoran, Inc.,* 35 F.3d 1008, 1011 (5th Cir. 1994). Thus, to establish a claim for maintenance and cure, a seaman need only show that his injuries occurred while in service to the vessel. *Boudreaux,* 280 F.3d at 468.

60.    The doctrine of maintenance entitles an injured seaman to the reasonable cost of food and lodging actually expended. *Hall v. Noble Drilling Inc.,* 242 F.3d 582, 587-88 (5th Cir. 2001). The doctrine of cure obligates the vessel owner to reimburse the seaman for his medical expenses actually incurred and to ensure that the seaman receives the proper treatment and care. *Boudreaux*, 280 F.3d at 468. The maintenance and cure obligation ceases only when the seaman has reached maximum cure. *Id.* Maximum cure is reached when it is probable that further treatment will result in no betterment of the seaman's condition. *Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 95 (5th Cir. 1985).

## APPORTIONMENT OF FAULT

61.    Under the Jones Act and general maritime law, defendants are liable jointly and severally to the Plaintiff. *Daigle v. L & L Marine Trans. Co.*, 322 F.Supp.2d 717, 732 (E.D. La. 2004) (*citing Hardy v. Gulf Oil Corp.*, 949

34

F.2d 826, 829 (5th Cir. 1992)).  However, in maritime tort cases where

more than one party is responsible, courts apportion liability on the basis of

fault according to the rules of comparative negligence.  *Id*. (*citing U.S. v.*

*Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251

(1975); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1130 (5th Cir.

1995)).

62. In this case, the Court finds that Crosby and Triton are liable for the

following percentages of fault:

Crosby: 50%

Triton 50%

63. The court finds no fault on the part of the plaintiff, Rottinghaus.

## DAMAGES

64. **Past medical expenses**: the parties stipulated that all past medical expenses

have been paid, so no award will be made.

65. **Future medical expenses**: the evidence was uncontradicted that

Rottinghaus will need the medications which he is currently taking to

control his headaches for life.  The cost of those medications, discounted to

present value, is $130,406, which is awarded.  Additionally, the Court finds

that cognitive retraining will benefit Rottinghaus and increase substantially

his post-accident earning capacity. The cost of this cognitive retraining in

the amount of $36,000 is awarded.  The Court further finds that
psychological counseling will benefit Rottinghaus, and will award the
amount necessary to provide 36 sessions over the next three years at the rate
of $150 an hour, for an award of $5,400.  Thus, the future medical expenses
awarded are $171,806.

66.    **Past wage loss**: At the time of the accident, Rottinghaus was employed by
Crosby Marine.  In his last full work year, 2012, he earned $86,435. The
economist retained to testify on behalf of the plaintiff used this amount to
calculate past lost wage.  The Court will use $7,200 per month ($86,400 per
year) to calculate past wage loss.  Because of a downturn in the oil and gas
production industry, all Crosby personnel took a 25% pay cut in January
2015.  The evidence showed that such increases and decreases in salary for
persons employed in the oil and gas production industry, as well as those
persons employed, like Rottinghaus, in industry support services, go up and
down over time.  To compute past wage loss, the Court will use the 2012
wage base, and will reduce wages for 25% from January 1, 2015 to August
1, 2015.  Accordingly, the following past wage loss award is made:

| | |
|---|---|
| May 22 – May 31, 2013: | $ 2,760 |
| June 1 – December 31, 2013: | $50,400 |
| January 1, 2014 – December 31, 2014: | $86,000 |
| January 1, 2015 – August 1, 2015: | $43,200 |
| **TOTAL**: | $182,360 |

36

67. **Future wage loss**: The economic expert retained by the plaintiff used wages which he opined Rottinghaus would make as a mate, not a boat captain, to make his computation.  The Court will do the same.  According to Department of Labor figures furnished by the vocational rehabilitation expert retained by the plaintiff, the median wage for mates on boats in Louisiana is $87,000 per year.

68. The Court finds that, after suitable cognitive retraining, Rottinghaus can return to work as a maritime dispatcher.  This will utilize his prior experience and allow him to transfer skills that he has acquired as a crew member. Based on the testimony of the rehabilitation expert retained by the defendant, such jobs are available in the industry.

69. According to the Department of Labor statistics furnished by the rehabilitation expert retained by the plaintiff, median wage for maritime dispatchers in Louisiana is $34,000 per year.  Thus, plaintiff has sustained a loss in wage earning capacity of $53,000 per year.  The Court finds that Rottinghaus has a retirement age of 59.4 years.

70. Crosby Marine proffered testimony that it pays its dispatchers as much as $60,000 per year and that Rottinghaus was suitable for appointment with Crosby at that rate.  It would be unreasonable to expect Rottinghaus to return to work for Crosby given this lawsuit.  Furthermore, the Court finds

37

that if the Court is going to use median wage as a mate that it is only fair to use median wage as a dispatcher to compute loss of wage earning capacity in this case.

71.    The defendants' expert economist, Dr. Boudreaux, opined that future wage loss in this case can be reasonably computed by multiplying the annual earning capacity loss by 18.  The Court agrees with this methodology, and will compute the future wage loss in that matter.  After multiplying the annual capacity loss of $53,000 by 18, the Court awards the plaintiff $954,000 in future wage loss.

72.    **General damages – neck**: the plaintiff was severely injured in this accident, sustaining trauma to his neck, head and upper back.  Plaintiff went through a long period of conservative treatment including physical therapy over an extended period of time.  Ultimately, after a long period of conservative treatment, plaintiff successfully underwent a two-level cervical fusion with instrumentation.  Fortunately, the plaintiff got a good result.  The Court awards $250,000 in general damages for the plaintiff's neck injury and resultant radiculopathy.

73.    **General damages – head and brain injury**: Rottinghaus sustained a serious closed head injury from which he has made a generally good, though only partial, recovery.  Rottinghaus has had memory loss and has

38

particular difficulty in verbal communication, which the Court noted during

Rottinghaus's testimony.  While he has trouble with verbal communication,

Rottinghaus has made accommodation and is able to reasonably

communicate verbally.  The Court believes that the cognitive retraining

suggested during trial will assist Rottinghaus in his day-to-day work

activities and social activities.  For several years after the accident,

Rottinghaus had debilitating headaches and remains sensitive to light and

sound on an episodic basis.  Rottinghaus is no longer able to do many of the

things which he was able to do prior to the accident.  Importantly,

Rottinghaus' ambition to become a boat captain is no longer available to

him. Given Rottinghaus' continuing headaches and his other losses as a

result of his head injury, the Court awards $450,000 for general damages

for the head and brain injury sustained by Rottinghaus.

74. **Found and fringe benefits**: While these items of damages are recoverable,

insufficient proof was adduced at trial so as to allow an award for these

items.

### RECAPITULATION OF DAMAGES TO PLAINTIFF

| | |
|---|---|
| Past medical expenses: | $0 |
| Future medical expenses: | $171,806 |
| Found: | $0 |
| Fringe benefits: | $0 |
| Past wage loss: | $182,360 (net of wage advances made to date) |

| | |
|---|---|
| Future wage loss: | $954,000 |
| General damages -- neck: | $250,000 |
| General. damages-- brain injury: | $450,000 |
| **TOTAL AWARD**: | $2,008,166 |

74.   The parties stipulated that the following amounts for damages to the vessels

have been incurred, which the Court rewards to each party, subject to

reduction for their own fault:

**CROSBY MARINER**

| | |
|---|---|
| MARINER hull repairs | $32,082.45 |
| MARMAC 22 repairs | $17,500.00 |
| Replacement barge | $18,000.00 |
| Crew drug screen costs | $ 1,508.35 |
| Survey costs | $ 3,018.93 |

**TRITON ACHIEVER**

| | |
|---|---|
| Hull repairs | $49,868.68 |
| Post-incident drug screens | $   844.70 |
| Compliance fees to ABS | $ 1,000.70 |
| Damage | $ 3,034.25 |
| Delivery and return of tapping tool to be used in riser installation job | $ 1,511.66 |

75.   As set out above, Rottinghaus has received salary advances from Crosby.

The past wage loss award shall be reduced (net of) all such amounts paid to

Rottinghaus. Additionally, since Triton will benefit from these payments,

judgment will be awarded in favor of Crosby against Triton for one-half of

all such salary advances made to Rottinghaus.

76.    Since the damages awarded Rottinghaus against Crosby are less than the

amount deposited into the registry of the Court pursuant to the limitation

proceeding, the Court need not make a finding on the limitation action.

## PREJUDGMENT INTEREST

77.    Because this is an admiralty case, the Court has the discretion to award

prejudgment interest, and exercises its discretion to award interest from the

date of Crosby's filing of this action (August 1, 2013) at the rate of .33%,

which is the most recently quoted rate for one-year constant maturity

treasury bills, on plaintiff's past damages described above (past lost wages

and past pain and suffering).  *See Blaauw*, at *21.

78.    In this Circuit, there is a strong presumption in favor of awarding

pre-judgment interest, and it will usually only be denied in cases where the

plaintiff exercised undue delay in bringing his action.  *Daigle v. L & L

Marine Trans. Co.*, 322 F.Supp.2d 717, 732 (E.D. La. 2004) (*citing U.S. v.

Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001)).

79.    The Court finds no such delay present in this case at bar and finds that

Rottinghaus is entitled to pre-judgment interest on past damages from the

date of judicial demand until the date paid, calculated at the rate of .33 %.

Further, claimant is entitled to post-judgment interest at the legal rate on all

remaining damages from the date of judicial demand until the date paid, as well as all taxable costs of court.

The parties shall submit a Judgment to the Court, approved as to form by all parties, in accordance with the above findings and conclusions within seven (7) days.

August 7, 2015, at Lafayette, Louisiana.

*C. Michael Hill*

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

42